Thank you, Chief Judge Sykes, and may it please the Court, this case presents a challenge to the defendant's system of contingency fee forfeiture prosecutions. And starting with mootness, if I may, as we describe in our briefs, three separate grounds confirm this case's justiciability. First, as to Ms. Sparger-Withers individually, there is the voluntary cessation doctrine, which maps neatly onto the recent FICRE decision. As in FICRE, Mr. Taylor's contingency fee arrangements remain unchanged, and again, as in FICRE, nothing prevents Mr. Taylor from violating Ms. Sparger-Withers' due process rights again in the future. Second, as to the class, there is the inherently transitory doctrine, which calls for a straightforward application of this Court's Olson decision. And finally, there is the picking-off doctrine, which the Fifth Circuit in 2020 applied to a putative class action challenging the constitutionality of a civil forfeiture regime. So I think really, under any of those three standards, this Court can be confident that it has jurisdiction to reach the merits. Now, on the merits, the party's main ground of dispute is whether the due process clause imposes any standard at all constraining prosecutors from having a direct and personal financial stake in the cases they prosecute. And our bottom line is that Marshall v. Jericho confirms that there is absolutely such a standard. That standard certainly is not as stringent as the due process standard applicable to judges under Toomey v. Ohio, but it is nonetheless a real standard. And the majority in the Louis Vuitton case, I think, clearly recognized that page 807. Let's talk about the justiciability issue for a few minutes. I'm not too sure I understand why this is not moved. Plaintiff's out of the case. Am I right? Plaintiff is out of the case. So the morning after we served Mr. Taylor with process, he voluntarily dismissed the state court action. Yes, Judge Reagan. And the reason that's not moved, and again, I think we're focusing here on the voluntary cessation doctrine. I'll leave the other two. Yeah. The reason it's not moved is for a couple of reasons. First, Mr. Taylor dismissed that case without prejudice, so nothing under the trial rules prevents him from refiling it again. Now, at times, the defendants have suggested that there's a two-year statute of limitations that acts as some kind of rule barring a refiling of the case. In fact, and we fleshed this out in fact, it's not at all clear that a two-year or a five-year limitations period might apply. Ultimately, it would have been entirely within Mr. Taylor's discretion. But he hasn't refiled the case. No, he has not, Your Honor. But I think the critical question under the voluntary cessation doctrine is whether he has the authority and the capacity to refile that case. And certainly, the defendants haven't carried their heavy, stringent, and formidable burden. Suppose he files the case again. Do we know that he's going to dismiss it? We absolutely— If you bring a lawsuit again? I don't think we can possibly know. And it's precisely because he has that kind of— There's nothing inherent in the situation that says it would necessarily become moved again, right? There is no inherent time limit on how long a civil forfeiture action lasts. And I think that goes more to the inherently transitory doctrine, Judge Ripple. But there was likely, likewise, nothing inherently limited in how long a detention in Tippecanoe County Jail would last in the Olson case. In that case, for example, 41 inmates at Tippecanoe County Jail stayed in that jail for more than a year. But what mattered for this court's inherently transitory analysis was that whether any particular plaintiff might get transferred rested entirely in the government's discretion. And if anything here, I would submit that Mr. Taylor has far more discretion to jettison any particular inconvenient forfeiture case than the prison bureaucracy had to transfer any particular inmate in the Olson case. So I think under Olson, this is really a straightforward candidate for— So you rely on the Olson case as your key authority? Under the inherently transitory doctrine, yes, Judge Ripple. Under the voluntary cessation doctrine, I would point you to Fickrey. But yes, I think this maps neatly onto the Olson case, particularly in light of the Supreme Court's decision in Nielsen versus Preab, where plurality certainly applied the inherently transitory doctrine where the actual detentions could last for a year or even longer. So I think kind of all roads lead to Rome here, whichever of those three justiciability doctrines we're talking about, I think this court can be confident that there's a lot of controversy here. Now, if I may, I'll touch briefly on the merits because I think the party's main ground of dispute is whether there is any due process standard that applies to prosecutors. And we submit that Marshall versus Jericho embodies such a standard. The defendants, and I think the district court's main response to that is to charge us with— I think the phrase was casting aside history and trying to substitute our own policy preferences for those of the legislature. But to be clear, our submission is not that the court should ignore history. It's that the court should apply the standard set by the Supreme Court. And here, for this court to adopt the defendants and the district court's kind of historical view of the due process clause, I think would necessarily break certainly with the Eleventh Circuit's precedent, likely with the Fifth Circuit's, the Second Circuit's, and for what it's worth, with the views of the U.S. Department of Justice. Now, for that matter, I do in fact think that the historical narrative here supports Marshall's standard in much the same way that the historical narrative supported Toomey's standard in Toomey versus Ohio. What is the Marshall standard in two sentences or less? Certainly. So I think it's best understood as obviously less stringent than Toomey's, but when there is a financial stake or some other kind of conflict that gives rise to a possibility of distorting the prosecutor's judgment away from pursuing the public interest. And there may well be difficult questions at the margins, but I think the Supreme Court in Marshall and other courts since then have recognized that when the prosecutor has a direct personal stake in kind of they get paid if they win a case and they don't if they don't, that's a paradigmatic example where the prosecutor has an interest in winning and maximizing how much they win. But the government's interest under our system of order of liberty is that justice be served and that the government's agents steward the public trust. But the court in Marshall did not say anywhere that it was recognizing a due process duty on the part of the prosecutor to be free from financial conflict of interest in the same way that it announced in Toomey and the Toomey line of cases a due process duty on the part of judicial officers adjudicators to be free from financial and other conflicts of interest as Toomey has been applied to other contexts going forward including in Caperton campaign contributions. And the court specifically disclaimed that it was pronouncing on the contours of the due process right in question here because any suggestion of improper influence or bias based on the scheme that was challenged there was so attenuated or remote that the court didn't have to pronounce whether there was a due process violation. So I mean that's how the decision reads to me because there's lots of quoting from Toomey that prosecutors are different and the reasons why prosecutors are different and so we don't have to we don't have to announce a due process principle here because this case isn't even in the ballpark. Well so I don't think that's quite right your honor because if you look at page 249 the court does say that prosecutors are public officials and they quote must serve the public interest but I think that to answer your question perhaps more directly it's certainly true that the court did not elaborate comprehensively and with precision is the court's words and it didn't didn't really announce a constitutional principle at all much less elaborate on it. You know it didn't say that there's a due process interest that's implicated when the claim rests on a prosecutorial conflict of interest. Yeah so respectfully I think that's the only way to make sense of what the Supreme Court did certainly in section 2b of that opinion and I'll note parenthetically that of course the 11th circuit has taken that view the DOJ has taken that view. The 11th circuit really misstated what was going on in Marshall including misquoting Marshall and to the extent that the 11th circuit was relying on the Louis Vuitton case that was a supervisory power case not a due process case. Justice Blackmun wanted to make it a due process case it wasn't a due process case it was all resting on the court's supervisory authority over the lower courts on matters of contempt. Sure so I don't disagree with you on that being the bottom line. So to the extent that that was the 11th circuit's authority doesn't help. Fair enough I won't belabor the 11th circuit's position then I will note though that if you look at page 807 of Louis Vuitton and I grant you it's a supervisory case the court spent a paragraph characterizing Marshall specifically and described it in a way that I think is fully consistent with our view that's at page 807 but setting that aside and addressing I think Marshall on the merits I think the only way to understand what the Supreme Court and Marshall was doing in section 2b was analyzing whether there was a realistic possibility of distorting the prosecutor's judgment away from stewarding the public trust and towards impermissible considerations like financial self-interest. But you know there's a difficulty I have with that and of interpretation of Marshall is I agree that to the extent that I believe Marshall said that could be a due process file it could be raised constitutional issues right a scheme in a scheme injecting a personal interest financial otherwise into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some context raise serious constitutional questions. So left open the possibility that in certain circumstances it may have constitutional implications but I guess I'm with Chief Judge Sykes and I don't really see a rule being announced at Marshall but let's say given the time constraints that let's assume that Marshall does not announce a the discrete confines right of this due process rule in this instance. The district court then went on to look at Medina and to wait and to look at history as you say and so do you have any response to that? Yes absolutely Judge Lee and I think the bottom line here is that even if we were starting from scratch and again I would submit that we're not but even if we were I think history likewise supports our reading of Marshall standard here because as I read the defendant's brief around page 26 27 they don't dispute that you know a traditional part of our criminal justice system is that the government and its agents you know have to steward the public trust. I don't think there's any dispute on that and to that extent I don't understand the defendants to be defending the judgment below and if you look at history I think the arc of the 18th and 19th centuries is fully consistent with Marshall's proposition that prosecutors you know must serve the public interest and that that principle is subverted when again in Marshall's words when a prosecutor is financially dependent on the maintenance of a high level of penalties. So for example if you look at some of the law review articles that we point to in our reply brief from the founding or even before the American tradition steadily departed from the British tradition of private prosecutions. I think the wool handler and does it okay so I guess then from there does it matter that here we're not talking about a person that's going to be prosecuting crimes and you're exercising their own discretion to prosecute to select which ones to prosecute but here under the terms of the contract the final decision to proceed to have seized assets declared forfeit is made by the publicly accountable prosecuting attorney and not Mr. Taylor. Does that have any impact in the analysis? No sorry I was gonna say no and for a couple of reasons. First I don't think there's any supportable line between kind of civil prosecutions. No no but but here the person that has the final say does not have any financial incentive in bringing a forfeiture claim right? Yeah I take the point. And so in that way isn't this very different from the historical instances that both sides kind of talk about? No I don't think so and I do want to make a make one factual point very clear because the contract certainly says what it says but if you look at the stipulations that are in this separate appendix the defendant stipulated clearly that in fact the prosecutor's offices have nothing to do with actually deciding whether prosecutions are wrong. I thought there was a county or two where there was more communication between the prosecutor's office and the attorney. Yeah so I believe in Henry County and I may be but in every other county it's entirely hands-on. Under Indiana law what is the potential authority of the prosecutor to intervene or to supervise closely? So I don't think Indiana law says anything one way or the other about that Judge Ripple. What we know from the record here however is that one the contracts themselves reserve to Mr. Taylor unilateral authority to decide whether to settle or proceed with the cases and to the extent the contracts do reserve some authority to his clients the parties have stipulated and the deposition testimony supports that in fact his clients take a very hands-off role. The Hancock County prosecutor for example testified that he quote takes great pains not to supervise Mr. Taylor. The problem may be that the prosecutors are lying down on the job. That very well may be correct your honor but at base what we're challenging here is not just the statute but also Mr. Taylor's contingency fee arrangement and under the contingency fee arrangement that they've stipulated they have Mr. Taylor exercises vast and unsupervised discretion over how to bring in whether to bring. Suppose a person resists having property forfeited says I'm not going to settle. Do they have to do what tell me about the judicial recourse they have? Sure so a property owner in a they can take the case to trial but I do think it's worth noting Judge Ripple that unlike in a criminal case there are a bunch of disadvantages that civil forfeiture defendants have. For example they're not entitled to appointed counsel the standard of proof is lower and here you have the very prosecutor who's bringing the case standing to make money if he wins and not if he loses. Are there any procedural advantages that Mr. Taylor would have that other civil litigants would not have? In other words you know there are cases that talk about whether or not a particular attorney has the power of the machinery of the state right subpoena power outside of the civil context. Does Indiana provide any sort of extra authority to Mr. Taylor than what other civil litigants would have? I mean I can point you to a couple of examples Judge Lee for example he has the power to seek ex parte seizures of property that's under the section 34 24 1 2 I believe and we point out in our opening brief that he certainly has you know police investigatory resources at his disposal but I think the more fundamental point is that he has. What does that mean? Oh so sure so for example it's in one of our footnotes in our opening brief but we pointed out that you know he kind of works cooperatively with police and they're searching people's cell phones and providing him information that they wouldn't get but for the fact that they're police officers but if I may I do want to be responsive to your question because I think the most has precisely the same prosecutorial function and precisely the same power as any full-time sworn deputy prosecutor who's bringing these forfeiture cases in any of the many counties in Indiana that do not rely on contingency fee prosecutors. His prosecutorial function is the same as any other sworn prosecutor in Indiana or elsewhere who brings these kinds of cases. What's the purpose of the forfeiture system? Ultimately it's uh has a variety of purposes Chief Judge Sykes of course described it as both punitive and serving somewhat ill-defined remedial purposes but I don't understand there to be any dispute that this civil forfeiture regime falls squarely on the sovereign criminal justice side of the spectrum when it comes to the kind of litigation that the government can be involved in. Right well what the reason for my question is you've argued that the due process principle here is that prosecutors serve the public interest and the due process clause suggests requires somewhere in between that there not be a conflict between the public interest and the prosecutor's personal interest pursuant to some sort of a test that we're trying to get our our arms around in this case. So we need to isolate what the public interests are in this forfeiture system and whether there's a misalignment a conflict between the prosecutor's personal interests and the public interests and I kind of see the interests as being aligned but maybe you can persuade me otherwise. Well I hope to Chief Judge Sykes because if you look at Mr. Taylor's deposition even he acknowledged that the government's mission in forfeiture cases is to achieve what he described as big J justice and by that I understand him to mean the same kind of um you know justice seeking mission that we see engraved on the you know foyer of the U.S. Department of Justice in D.C. But in concrete terms what is the policy reason for a forfeiture system like this? What is the government's objective? Certainly so ultimately it is to punish people who have either violated the law or let their property be used in violations of the law. Property cannot be forfeited under the civil forfeiture statute unless Mr. Taylor proves by a preponderance of the evidence that a violation of Indiana state criminal law has taken place. As the district court acknowledged you know for all the flaws that we see in in that opinion the district court acknowledged that this falls squarely on the criminal side of the spectrum here and so I think for purposes of identifying what the public interest is I think it's largely interchangeable with the public interest that an assistant U.S. attorney has to serve in prosecuting a felony case or a state prosecutor serves in bringing a capital case. The goal is not um to uh to make money for that particular prosecutor the goal is to achieve a just result and I don't understand there to be a serious argument from the defendants that if in fact Marshall Standard is what we say it is that Mr. Taylor's contingency fee arrangement cannot stand well the Indiana Supreme Court has identified other objectives of the forfeiture system beyond punishing or disincentivizing um cooperation with criminals via the use of property um I think that's articulated in the canter in other cases. Sure yeah I think canter refers to remedial purposes but I think the same could be said of any kind of you know criminal law enforcement right like the purpose of putting someone in prison is not purely punitive purely deterrent it also serves to incapacitate people and remediate and so I I don't think that there's any material difference between the interest that the government has to serve in bringing civil forfeiture cases versus the interest that the government has to serve in bringing criminal cases and that I think in large part is why when you have forfeiture prosecutors facing damages liability for violating people's rights they typically successfully invoke the kind of absolute prosecutorial immunity that attaches only because there's this concern that any kind of financial considerations might skew the public trust. So in in that rationale if we had to choose between the Matthews interest balancing test and the Medina test you uh would support the Medina test? I suppose that's right Judge Lee I mean I think ultimately it kind of both of those would lead to the same result if you look for example. No I understand but you have to choose one. Sure um I mean I think that we would win under Matthews and I would point you to uh retired Justice White's reasoning in the Ninth Circuit case where he basically said that a a biased proceeding is one that is necessarily not sufficient under the due process. You said you'd go under Matthews I thought you just spent five minutes talking about how criminal forfeitures are actually criminal in nature which would lead us to Medina. I think that's right and I'm not trying to deduct the question but yes I mean I think if we were applying Medina we absolutely would win here too and it would basically support the standard that we say Marshall articulates because ultimately and I say I'm over my time but if I can answer your question um ultimately I think what the historical record shows is that at least starting in the 19th century anytime anybody spent more than a couple of minutes thinking about contingency fee prosecutions the overwhelming consensus is in the words of one federal judge uh that this was an unspeakable evil and a disgrace to the republic and so you have you know the Kentucky High Court in 1864 saying a contingent fee dependent on conviction ought never to be permitted to stimulate assistant counsel. If the Wisconsin Supreme Court in 1888 you have the New Mexico Supreme Court drawing on these same principles in 1920 to describe it as abhorrent the sense of justice so I do think whether we're talking about Marshall articulating its own standard which I I think is the only way to read the result there or whether we're talking about Medina ultimately the contingency fee arrangement that we have here is far on the side of the unconstitutional end of the compensation spectrum. Your one last question I know we're way over time but your historical argument really depends on situating the historical analysis at the time of the ratification of the 14th amendment rather than during the founding era because it was before slightly before and at that time and certainly after that time that these new norms came into play in our legal history and tradition not at the founding. Well so I don't know if I would agree with that Chief Judge Sykes if you look at the Woolhandler and Nelson article which we have in our reply brief I think they make a persuasive historical case that even before the founding the American criminal justice tradition was moving away from that tradition of private prosecution and they also point out that you know the district court points to the Adams versus Wood case I think which was from Chief Justice Marshall and professors Woolhandler and Nelson actually point out that I think folks since then have overread that decision as suggesting that kind of key tam was rampant under all kinds of penal statutes at the time. So I think as a historical matter that's not necessarily correct but certainly by the time we get to you know 1830s, 40s, 60s, 70s you know the overwhelming consensus is that this is absolutely corrosive to the criminal justice system and I'll just note parenthetically that if we're looking at the kind of history the court was doing in Toomey or if we look at Justice Alito's Bandita analysis and at his separate opinion in Nelson versus Colorado they don't stop the clock at 1791 or for that matter even at 1868 like they're looking at cases up through the 1890s and likewise here if you look at the overarching course of history in the 18th and 19th centuries I think what you'll see is that there's an overwhelming consensus you know that that this is a system that pits the interests of the prosecutor in making money against the government's interest in ensuring that justice is done to its citizens. Thank you. Thank you. Mr. Barda. May it please the court at the time the 5th and 14th amendments were adopted for decades afterwards it was common for governments to reward interested parties for uncovering and successfully prosecuting wrongs. Embracing Sparger Withers position would require rejecting the very historical tradition that the Supreme Court regards as its primary guide to due process and require this court to part ways with other appellate courts upholding contingency fees for attorneys retained by the government. But I don't think the court actually has to get to the merits in this case due to the mootness issue and I'll start there before talking more about the due process. Sparger Withers' claims for prospective relief became moot when the only forfeiture action involving her property was dismissed six days after this case was filed and there's no reasonable expectation that the previously dismissed forfeiture action could be refiled because it would be time borrowed. Under Indiana law a forfeiture action has to be filed within 90 days of the seizure or 21 days of a property owner demanding return of the property whichever comes first and since the forfeiture here occurred in January 2021 any refiled forfeiture action would be time borrowed under the plain text of the law. Probability of refiling is not an issue under the inherently transitory doctrine? Correct your honor and so I think turning there the inherently transitory doctrine is fundamentally an equitable doctrine designed to allow classes to be certified in cases where it just couldn't otherwise happen and I think this court has made clear in Trotter and Banks that the doctrine is not available when a plaintiff makes a strategic call to a delay bringing suit and that's exactly what happened here. Sparger Withers could have filed this federal action at any point after the forfeiture case was filed on February 1st 2021 but she waited until November 2021 after she was acquitted in state court for the predicate crime to file this forfeiture action. That means there's a and I think that 282 day period pales in comparison to the 70 day period in Banks or 100 or sorry 70 day period in Trotter or 112 day period in Banks where this court held that the inherently transitory doctrine was not available when the suit. I thought the in Olson the focus was more on whether or not the plaintiff had reason to know that the claim might become moot as opposed to whether there was a strategic decision to wait to file and certainly that was the case with regard to the name plaintiff in Olson and it seems that here too Ms. Sparger Withers had no idea that Mr. Taylor would dismiss her case without prejudice when he so conveniently did right after she filed suit and filed the motion for class so why wouldn't that fall squarely within Olson? Your honor I think at page 252 Olson set aside the situation in which a litigant waits to bring suit but I think the other key piece in analyzing Sparger Withers case is that she certainly knew the forfeiture action would stick around for a while after it was filed because as she noted in that motion she filed in November 2021 in state the state forfeiture action was effectively stayed in February 2021 pending resolution of the criminal trial which happened in November and so you know I think it's not surprising that after she was acquitted in the criminal trial there was a decision made that the forfeiture action simply was not worth pursuing at that point in front of the same judge who just said she's not guilty of drug dealing but I think the for the purposes of determining whether it's appropriate to apply an equitable doctrine that the court should not be in the position of rewarding litigants who make a strategic call to delay filing suit. What about I mean on the flip side should we award defendants for strategically dismissing cases in order to circumvent judicial review of actions that they're taking with regard to other members of the purported class? Well no your honor I think that's exactly what the picking off doctrine gets at is manufactured mootness but the testimony here was that the forfeiture action was not dismissed to moot the federal case rather it was because she was acquitted of the unpredicate crime in state court which just changed the merits of the analysis and I think for the purposes of the inherently transitory doctrine which is what the district court went with rather than picking off is that we also have to bear in mind that it asked whether any potential plaintiff in the class could bring the case and as noted at page 46 of our brief there are certainly cases in which other members of the class could could file this due process claim because forfeiture actions can last for months or years sometimes because they are stayed at the property owner's request pending the outcome of criminal proceedings but unless there's further questions with mootness I'll turn to the due process laws. It's important to remember that the states presumptively have the power to decide how their laws carried out so Sparger Withers has to show not just that Indiana could have developed a better or more popular system of retaining private counsel to assist with forfeitures but that the system it adopted would have been rejected by those who framed the fourth or fifth and 14th amendment as contrary to settled principles of justice and she can't either as a matter of history or precedent. So on the history side there are four distinct lines of history that show that it was common at the time the fifth and 14th amendments were adopted to reward persons for successfully uncovering and prosecuting wrongs. Those are we first have the long-standing tradition of private prosecutions in which victims of a crime could hire their own to file criminal charges against people and a tradition that remained in common use not only from the founding but into the 19th 20th century. I think in the Cardenas article it says in 1951 it was still very common to have private prosecutions and at last count I think today there's 20 states that still permit private proper prosecution from Massachusetts to Ohio to Washington. The second strand we have is the payment of conviction fees. In the 19th century about two-thirds of the states and the federal government paid prosecutors fees for successfully winning criminal cases. Now in the late 19th century that started to fall out of favor for reasons as Congress decided there were better ways to generate public support for new laws that were less popular but it what certainly wasn't a settled tradition to forbid them. Third we have the the moiety or bounty system in which federal officials were paid a share of goods that they uncovered or paid a share of fraudulently invoiced goods that they uncovered at customs houses. A tradition again that was existed for about the first 90 years of this country's existence and then finally we have key TAM actions still in use today in which the private parties who are pursuing these actions in the name of the government are rewarded for success. Now in in terms of the the question earlier I don't think it matters what historical period we were looking at whether it's the 5th or 14th amendments time of adoption because these practices were still in widespread use at both times and as the Supreme Court reminded us in Montana versus Engelhoff a plaintiff challenging a procedure as contrary to the due process clause has to show more than that just that the states or the federal government were moving away from the practice at the time the 14th amendment was adopted. They have to show there is a settled tradition rejected and that whatever else that doesn't exist here. Turning to the precedent side you know that we simply don't read Marshall as establishing with particularity any standard regarding what incentives are appropriate or not appropriate for advocates. All that is said is that whatever the standard we apply the incentives here are too remote and insubstantial to raise a process problem which I think then brings us exactly back to history as the Supreme Court in order to understand what if any due process limits there are. What are we to make of the court's statement at the end of Marshall as follows but in light of the factors discussed above it is clear that this possibility is too remote to violate the constraints applicable to the financial or personal interests of the officials charged with prosecutorial or plaintiff-like functions. So that's sort of like as a I don't know holding light or something I'm not sure what it is but we have to make some sense of it because the court was clearly saying something and even if it's dicta we have to pay attention to what the court says. Yeah so I think the best way to read is the court was proceeding on the assumption that there is some kind of standard because as it noted at the end of section 2a the government did not take the position in that case there was no due process standard applicable to advocates and so it was just proceeding on the assumption there was some kind of standard and it said whatever the standard we apply there's no problem and I think the the citation to the realistic appraisal language that Sparker Withers likes to talk about in a brief underscores that that language comes from Withrow versus Larkin the case about the due process standards for administrative adjudicators which the regional administrator was here the regional administrator certainly had some advocacy functions but also was in the business of assessing penalties and Withrow said that there you know even if we were to and so that was a case about the due process standards for judges and I think the just shows that the Supreme Court was saying in Marshall even if we were to apply the strictest possible standard there is no due process problem but the court said in a footnote it wasn't doing that footnote 14 yes your honor I think I I think that the I think I tend to read that footnote as suggesting that you know the the court was just saying we have some more leeway as it did in where it said that the standards for article three judges aren't the same for administrative adjudicators and so it was sort of in that middle ground but between article three judges and advocates and I think that's the best way to make sense of the decision but even if we were to accept the premise that there is some standard in Marshall I don't think that it changes the analysis in looking at the arrangements here for a couple of reasons first it is important to remember that the the incentive structure here actually aligns the advocates incentives with the states the the advocate here is retained by the state his client is the state he has an ethical obligation to pursue the state's interest and the mere fact that he's paid on contingency doesn't pit his interest against his clients any more than in any other civil case in which an advocate is contingent that depends on what the state's interests are well I agreed your honor and I think that's in if we're looking at what those means in concrete terms we know by the enactment of the statute that the legislature has made the determination it is in the state's interest to seek the forfeiture of property where it's an instrumentality or proceeds of a crime and the other important fact here is we have elected public prosecutors who have made the determined that it's determination that it's in the state's interest to hire a private attorney on contingency to pursue these forfeitures and at any time if they decide that it's no longer in the state's interest they can stop referring cases they can terminate the agreement or they can make the decision that an individual property owner should not have a piece of property declared forfeit the indiana supreme court in the canter case said there's also a taxation offset interest here as well as a deterrent interest in deterring by creating an economic disincentive persons from engaging in future illegal acts and permitting their property to be used to engage in future illegal acts but there's also a significant taxation minimization purpose in play here which is probably more closely aligned with the personal financial incentive that the statutory scheme creates for mr taylor there's at least a potential for divergence in the criminal punitive function a conflict of interest because the prosecutor would be incentivized to increase his own pay by pursuing forfeitures even when there's not a link to the congressional or to the commission of the crime well respectfully honoring i think the actually the opposite is true so to be clear this is a a civil action with a private attorney not a prosecutor but the one of the things that a contingency fee arrangement does it is actually creates an incentive to vet the case as well before filing them to make sure that these are actually meritorious cases an incentive someone may not have if they're just being paid by the hour we're on a fixed fee and i think as this court has said in other contexts contingency fees actually serve as a monitoring device making sure an attorney is spending appropriate amounts of time on different cases and making sure they are meritorious and so i think that it actually serves to align their interest here and i i think the final consideration is it's hard to see if this is unconstitutional why other arrangements are not states not only hire private attorneys to pursue a wide variety of actions but also public prosecutors have to stand for elections they face pressures at the ballot box their subordinates face face pressures to perform well to keep their jobs there are no further questions thank you um mr getch um you had used all your time but um you can have some additional time and rebuttal if you have questions thank you so are we going to extend caperton to um elected prosecutors well no i don't think so your honor and in fact in the louis vuitton case what the court said in describing marshall was that we you know said that you know this situation in marshall was okay even though it might be intolerable in the context of a judge so the court clearly was identifying two different strands of standards uh from marshall um i do if i may want to take a quick trying to persuade you that marshall actually did articulate some kind of standard um because it is passing strange i think it would be highly uncommon for the supreme court to say well there might or might not be some kind of standard in this case or controversy um we're not going to decide uh but we're going to reverse on the merits um i just don't think that's how the supreme court resolves controversies um and i understood my friend mr barter to acknowledge i think that marshall stands for i think his words were some kind of standard right and that conflicts with the position that it's all based on history well i think that's precisely right and i won't belabor the fact that i think history absolutely supports marshall's standard but if we're all sharing common ground that marshall in fact articulates some kind of standard i think the question becomes well why don't we look at the applying law to facts section in marshall as the most instructive data point for determining what that standard is and here the court and marshall i believe four times emphasize that no individual prosecutor stood to profit economically from vigorous enforcement we've cited them in the brief i think there's four but i may be off by one or two and here even the district court acknowledged that it is quote hard to uh imagine a financial interest more direct than the kind of financial interest we have here so i think if marshall means anything like what we say it means and we submit that it does i don't think there's any serious argument that mr taylor's contingency the arrangement violates it thank you thank you our thanks to all counsel the case is taken under advisement we'll move to our